COLT / SINGER / BEA LLP
  Doug W. Colt (Bar No. 210915)
  dcolt@coltsinger.com
  Walter C. Pfeffer (Bar No. 289421)
  wpfeffer@coltsinger.com
255 Shoreline Drive, Suite 540
Redwood Shores, California 94065
Telephone:   (650) 887-6650
Facsimile:   (650) 887-6650
Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| 24/7 CUSTOMER, INC., | CASE NO. 14-CV-02561-EJD |
| Plaintiff, | **DEFENDANTS' NOTICE OF MOTION, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| 24-7 INTOUCH and ASCENDA USA, INC., | Date: December 5, 2014 |
| Defendants. | Time: 9:00 a.m. |
| | Courtroom: 4 |
| | Hon. Edward J. Davila |

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on Friday, December 5, 2014, at 9:00 a.m., or as soon thereafter as the matter may be heard by the Honorable Edward J. Davila, in Courtroom 4, Fifth Floor, United States District Court for the Northern District of California, Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, California 95113, Defendants 24-7 Intouch, Inc. and Ascenda USA, Inc. (together, "Intouch" or "Defendants") will and hereby do move the Court for an Order dismissing the claims of Plaintiff 24/7 Customer, Inc. ("[24]7 Customer").

The Motion will be based on this Notice of Motion, the Memorandum of Points and Authorities in Support Thereof, Defendants' Request for Judicial Notice, the [Proposed] Order filed herewith, and any further evidence or argument that the Court may properly receive at or before the hearing.

## RELIEF REQUESTED

Under Rules 12(b)(6) of the Federal Rules of Civil Procedure, Defendants request that the Court dismiss [24]7 Customer's claims with prejudice.

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................... 1

II. FACTUAL BACKGROUND .............................................................................................. 2

    A. Intouch's Website ..................................................................................................... 2

    B. Intouch's Social Media ............................................................................................ 2

    C. Public Articles About Intouch .................................................................................. 3

    D. Industry Recognition of Intouch .............................................................................. 3

    E. Industry Tradeshows ................................................................................................ 3

    F. Print Advertising ...................................................................................................... 4

III. LEGAL ARGUMENT ......................................................................................................... 5

    A. [24]7 Customer's Trademark Claims are Time-Barred by the Statute of Limitations ................................................................................................................ 5

    B. [24]7 Customer's False Advertising Claim is Also Time-Barred ........................... 6

    C. [24]7 Customer's Unfair Competition Claim is Also Time-Barred ........................ 7

    D. [24]7 Customer's Claims are Also Barred by Laches ............................................. 7

    E. [24]7 Customer Fails to State a Claim Regarding its Trademarks ........................ 12

    F. [24]7 Customer's Claims Should be Dismissed with Prejudice ............................ 14

IV. CONCLUSION .................................................................................................................. 15

- ii -

DEFENDANTS' NOTICE OF MOTION, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
CASE NO. 14-CV-02561-EJD

# TABLE OF AUTHORITIES

CASES

*AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th. Cir. 1979) .......................................................... 13

*Aoki v. Gilbert*, No. 2:11-cv-02797-TLN-CKD, 2014 U.S. Dist. LEXIS 101151 (E.D. Cal. July 23, 2014) ............................................................................................................................................. 7

*ATM Express, Inc. v. ATM Express, Inc.*, No. 07-cv-1293, 2009 U.S. Dist. LEXIS 83756 (S.D. Cal. Sept. 11, 2009)..................................................................................................................... 10, 13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................................. 14

*Brookfield Communications v. West Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999)................. 12

*E-Systems Inc. v. Monitek, Inc.*, 720 F.2d 604 (9th Cir. 1983) ................................................. 5, 6, 9, 11

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987)...................................... 13

*GoTo.com, Inc. v. Disney*, 202 F.3d 1199 (9th Cir. 2000)...................................................................... 7

*Grupo Gigante SA DE CV v. Dallo & Co. Inc.*, 391 F.3d 1088 (9th Cir. 2004)........................ 5, 6, 7, 9

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir. 1999)..................................................... 8, 9, 11

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002) ............................. passim

*Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848 (9th Cir. 1992)...................... 6

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042 (9th Cir. 1998) .............. 10, 13

*Medimatch, Inc. v. Lucent Techs., Inc.*, 120 F. Supp. 2d 842 (N.D. Cal. 2000) ................................... 7

*Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004) ....................................... 8, 9, 11

*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975 (9th Cir. 2006) ...................................................... 5, 8

*Reddy v. Litton Indus., Inc.*, 912 F.2d 291 (9th Cir. 1990) ................................................................. 15

*RSI Corp. v. IBM*, No. 5:08-cv-3414 RMW, 2012 U.S. Dist. LEXIS 112294 (N.D. Cal. Aug. 9, 2012) ............................................................................................................................................. 8

*Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096 (N.D. Cal. 2008)........................... 5, 6

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217 (9th Cir. 1996) .............................................. 12

*Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353 (C.D. Cal. 1995) ..................... 7

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*, 465 F.3d 1102 (9th Cir. 2006) ....................................................................................................................................... 8

STATUTES

Cal. Bus. & Prof. Code § 17208 ................................................................................................. 7

# MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Rule 12, Defendants, by and through their undersigned counsel, hereby move this Court for entry of an Order dismissing all claims in [24]7 Customer's Complaint with prejudice.

## I.   INTRODUCTION

On June 3, 2014, [24]7 Customer filed suit against Intouch alleging federal and common law trademark infringement, false advertising, and unfair competition based on Intouch's use of the "24-7" and "24-7 Intouch" designations. Compl. ¶¶ 16, 18, 26, 27, 32, 35, 36, 40, 41. [24]7 Customer was incorporated in 2000, while Intouch was incorporated in 2001. Defendants' Request for Judicial Notice ("RJN") Ex. 4. Because [24]7 has been aware of its potential claims for more than a decade, all of the causes of action are barred by the applicable statutes of limitations, as well as the equitable defense of laches.

[24]7's knowledge of its claims can be readily established through extensive evidence subject to judicial notice. Since their incorporations, both companies have provided "goods and services that are nearly identical," including "contact center solutions," "customer analytics," and "software platform[s] that allow[] agents to provide service on multiple platforms" to their customers, who include "many of the world's most recognized companies and brands … and other clients in the financial services, retails technology, communications, and travel industries…." Compl. ¶¶ 15–17, 18. In short, these two companies have been operating in the same space for over twelve years.

From the very beginning, Intouch has advertised its business using the "24-7 Intouch" brand both online and in print. Intouch has been recognized repeatedly as a leader in the industry, been the subject of numerous articles, participated in social media, and sponsored industry events—all using its "24-7 Intouch" brand. Intouch has made its name so well-known that there is simply no way that a company in the same industry avoided repeated exposure to the "24-7 Intouch" brand for nearly a decade between November 2001 and June 2010.[1] Because [24]7 Customer, which incorporated only a year prior to Intouch,[2] could not possibly have failed to discover Intouch's brand while simultaneously policing its alleged trademark rights, the Court should dismiss [24]7 Customer's claims. Alternatively, [24]7 Customer's claims should be dismissed to the extent they rely on the

---

[1] As discussed *infra*, Section II, the four-year statute of limitations on [24]7 Customer's claims requires dismissal if [24]7 Customer knew or should have known of the facts underlying its causes of action prior to June 3, 2010.
[2] *Cf*. RJN Exs. 4, 5.

1  trademarks for "24/7" and "[24]7," neither of which is sufficiently distinctive to support a cause of
2  action for infringement.

## II. FACTUAL BACKGROUND

### A. Intouch's Website

Intouch has maintained its website, www.24-7intouch.com, for the entire time it has been in business. Indeed, Intouch registered the domain "24-7intouch" on September 13, 2001, even before it incorporated. *Id.* at Ex. 6. While the website has changed numerous times, one component has remained constant: the front page has always prominently displayed the "24-7 Intouch" brand. *Id.* at Ex. 7 (showing the Intouch website from November 2001, February 2004, June 2005, and April 2007).

In addition to maintaining its website, Intouch also ensured that anyone interested in customer service, contact center outsourcing, or customer analytics would be directed to the Intouch website by participating in Google's Adwords program. Over the past decade, Intouch has paid millions to bid on certain search terms so that the Intouch website would be returned as a top hit when those search terms (or similar terms) were run. As a result, anyone performing an internet search for keywords such as "Call Center," "Call Centers," "Call Center Services," "Customer Support," "Direct Response," "Help Desk," "Order Taking," "Teleservices," "Outsourcing," "Call Center Outsourcing," "Contact Center Outsourcing," or similar terms would be directed to Intouch's website.

Intouch has also undertaken efforts to ensure that their website is a top result for Google's organic searching for any search terms related to its business. For example, a search for "24/7 Call Center" on Google returns Intouch as the top result, above [24]7 Customer. See RJN Ex. 65. As a result of Intouch's web efforts to maximize its web presence, anyone searching for contact center solutions or related services between 2004 and 2010 would have been exposed to Intouch's brand.

### B. Intouch's Social Media

Knowing that Intouch's success required it to maximize its visibility, Intouch also embarked on a broad social media campaign. Before June 3, 2010, these efforts included Facebook, Twitter, and even posts on Blogspot.com. *See* RJN Exs. 31, 32, 63, 64, 66. Intouch has made every effort to

ensure that anyone interested in customer service, contact center outsourcing, and customer analytics will recognize the "24-7 Intouch" brand.

### C. Public Articles About Intouch

In addition to maintaining and promoting its website, Intouch has benefitted from significant media coverage from both online and print publishers. *Internet Retailer*, a magazine that "cover[s] strategies and practices that produce success in e-retailing,"[3] featured Intouch in numerous articles (both online and in print) prior to June 3, 2010. RJN Exs. 19–25. Given Internet Retailer's target audience, anyone interested in marketing their goods to the online and multichannel retail industry would be aware of these articles. *Cf*. Compl. ¶ 19 ("[24]7's potential customers[] includ[e] clients in the following industries … Online & Multi-Channel Retail….").

Intouch was also featured in many other publications prior to June 3, 2010, including *PRWeb*, *TMC News*, *SIP Trunking Report*, *Mobility Techzone*, *PROskore*, *Market Wired*, and *Interactive Intelligence*. RJN Exs. 8–18, 27–29. These articles reflect Intouch's visibility within the industry and across the internet as a whole. In fact, Intouch made such an impression on industry practice that it was featured in a 2005 article by a Texas A&M professor, which was published in the United Nations' *Transnational Corporations* journal. RJN Ex. 30. Intouch's exposure is not just relegated to North America; Intouch has succeeded in creating brand awareness at the global level.

### D. Industry Recognition of Intouch

Intouch has been recognized repeatedly as a leader in the customer service, contact center outsourcing, and customer analytics industry. For example, Intouch was named a "Top 50 Teleservices Agency" eight years in a row by *Customer Inter@ction Solutions* magazine, a monthly magazine serving the call center services industry. Intouch received this award five times prior to June 3, 2010. *See* RJN Exs. 10, 15, 18. Similarly, Greg Fettes and Jeff Fettes, Intouch's founders, received the Business Development Bank of Canada's 2007 Young Entrepreneurs award, which recognized the success and growth of Intouch. RJN Exs. 16, 17. Given its repeated recognition as a leader in the call services industry, there is simply no way that a reasonably informed company in the industry could be unaware of Intouch's brand.

### E. Industry Tradeshows

---

[3] *See Internet Retaliner*: About Us, *available at* http://www.internetretailer.com/about/#/our-company.

1    Intouch regularly attends industry tradeshows, and proudly promotes its "24-7 Intouch" brand
2 at each one.  *See* RJN Exs. 72 ("NCOF Booth # 608").  For example, Intouch attended the *Internet*
3 *Retailer* Conference & Exhibition every year since 2006.  *See* Exs. 70 ("IRCE 2008 Booth #736), 48,
4 71 ("IRCE 2009 Booth #722"), 62 (IRCE 2010 Booth 541).  Intouch also sponsors many of these
5 events, including the 2009 Society of Consumer Affairs Professionals in Business ("SOCAP")
6 International Symposium and the 2010 *Internet Retailer* Conference & Exhibition.  RJN Exs. 61, 62.
7 As a sponsor, Intouch's logo is included on all event materials, guaranteeing wide exposure among
8 those in the industry.  Intouch even released a series of YouTube videos publicizing their
9 participation in various tradeshows.  RJN Ex. 69.  Given its heavy involvement with industry
10 tradeshows, any reasonably informed industry participant would have been well aware of Intouch's
11 brand prior to June 3, 2010.

12   **F.  Print Advertising**

13   Intouch has also conducted an extensive print advertising campaign.  Its advertisements, all of
14 which include the "24-7 Intouch" brand, have appeared in countless issues of *Internet Retailer*,
15 several 2008 editions of *Multichannel Merchant*, and even in the Yellow Pages.  RJN Exs. 33–60.  In
16 fact, Intouch and [24]7 Customer have both partnered with the exact same counterparty.  In 2006,
17 [24]7 Customer partnered with LivePerson.  RJN Ex. 67, 68.  Three years later, in 2009, Intouch
18 formed its own partnership with LivePerson, touting their synergy in a number of print
19 advertisements.  RJN Ex. 45.  Intouch has not only advertised in the same industry as [24]7
20 Customer; they have in fact partnered with the exact same company.  As a result of Intouch's
21 campaigns over the past fourteen years, there is no way that [24]7 Customer could avoid exposure to
22 Intouch's logo and branding.

23   **G.  [24]7 Customer Brings Suit 12 Years After Intouch Begins Marketing Efforts**

24   [24]7 Customer brought suit against Intouch on June 3, 2014, alleging federal and common
25 law trademark infringement, false advertising, and unfair competition based on Intouch's use of the
26 "24-7" and "24-7 Intouch" designations.  Compl. ¶¶ 16, 18, 26, 27, 32, 35, 36, 40, 41.  [24]7
27 Customer brought this suit more than twelve years after Intouch incorporated, registered its website
28 domain, and began its multiplatform advertising campaigns; eleven years after Intouch won the
CAM-X Call Centre Award of Distinction; at least a decade after Intouch was featured in its first

1  third-party article; a decade after Intouch was awarded the ATSI Call Center Award of Distinction
2  (the first time); at least nine years after Intouch was first featured in *Internet Retailer* magazine; nine
3  years after Intouch was discussed in the United Nations' *Transnational Corporations* journal; eight
4  years after Intouch was named one of the Top 50 Teleservices Agencies by *Customer Interaction*
5  *Solutions* magazine (the first time); and five years after Intouch first sponsored the SOCAP
6  International Symposium. RJN Exs. 4, 6–72.

## III. LEGAL ARGUMENT

### A. [24]7 Customer's Trademark Claims are Time-Barred by the Statute of Limitations

The Ninth Circuit applies a four-year statute of limitations to both federal and common law claims for trademark infringement. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006). This four-year clock begins running from the time at which the plaintiff knew or should have known about its cause of action. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002). Under the "should have known" standard, often referred to as "constructive knowledge," "a trademark owner is chargeable with the information it might have received had due inquiry been made. The constructive knowledge standard imposes on a trademark owner the duty to police its rights against potential infringers." *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1110 (N.D. Cal. 2008) (internal citations omitted). *See also Grupo Gigante SA DE CV v. Dallo & Co. Inc.*, 391 F.3d 1088 (9th Cir. 2004) ("Companies expecting judicial enforcement of their marks must conduct an effective policing effort."); *E-Systems Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983) ("Plaintiff ought to have discovered defendant's use sooner had it been diligently seeking to enforce its mark.").

[24]7 Customer's trademark claims are time-barred because it knew or should have known of the facts underlying its infringement causes of action by June 3, 2010, four years prior to the filing of its Complaint; indeed, the evidence shows that [24]7 should have been aware of such facts *years* earlier. [24]7 Customer's infringement allegations are based on Intouch's use of the "24-7" and "24-7 Intouch" designations. Compl. ¶¶ 26, 32. Customer has allegedly been using marks that included "[24]7" as a core element since 2000. Compl. ¶¶ 10-13. However, as detailed in the previous section, Intouch's brand was widely known to the entire customer service, contact center outsourcing, and customer analytics industry for nearly a decade before [24]7 Customer brought its suit. As only a

1   few examples, Intouch has been recognized repeatedly as a leader in the industry (RJN Exs. 8, 10,
2   16–18, 27–29), been the subject of numerous articles (RJN Exs. 8–30), conducted a wide-scale
3   advertising campaign (RJN Exs. 33–60, 69–72), actively directed traffic to its website (RJN Ex. 6–7,
4   65), participated in social media (RJN Exs. 31–32, 63, 64, 66, 69), and sponsored industry events
5   (RJN Exs. 61, 62, 70–72). All of these events predate June 3, 2010.

6         Throughout this entire period, [24]7 Customer operated in the same industry and in the same
7   market as Intouch. *Cf.* Compl. ¶ 16 ("Intouch uses the designations '24-7' and '24-7 Intouch' in
8   connection with the sale, offers of sale, distribution, and advertisement of goods and services that are
9   nearly identical to the goods and services offered by [24]7."); ¶ 19 ("Intouch markets its goods and
10  services to [24]7's potential customers…."). It is simply not possible, nor even remotely plausible,
11  that [24]7 Customer could have properly policed its alleged trademark rights and nonetheless failed
12  to discover the facts underlying its present claims for nearly a decade. *Cf. Saul Zaentz* at 1110;
13  *Grupo Gigante* at 1102; *E-Systems* at 607. As a result, [24]7 Customer's federal and common law
14  trademark claims should be dismissed on statute of limitations grounds.

15        **B.   [24]7 Customer's False Advertising Claim is Also Time-Barred**

16        [24]7 Customer's false advertising claim is time-barred for similar reasons. The Ninth Circuit
17  applies a three-year statute of limitations to false advertising claims under Section 43(a) of the
18  Lanham Act. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002); *Karl*
19  *Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 857 (9th Cir. 1992). As with a
20  cause of action for trademark infringement, this three-year period "runs from the time the plaintiff
21  knew or should have known about his § 43(a) cause of action." *Jarrow*, 304 F.3d at 838.

22        [24]7 Customer's allegations regarding its false advertising claim are merely that "Intouch's
23  use of the designation '24-7' and '24-7 Intouch' constitutes a false advertisement…." Compl. ¶ 35.[4]
24  Therefore, if [24]7 Customer knew or should have known of Intouch's use of the "24-7" and "24-7
25  Intouch" designations prior to June 3, 2011, then its false advertising claims will be time-barred. As
26  described above, there is ample evidence that [24]7 Customer knew or should have known of
27  Intouch's use of "24-7" and "24-7 Intouch" long before June 3, 2011. [24]7 Customer's false
28  advertising claim should therefore be dismissed on statute of limitations grounds.

---

[4] [24]7 Customer's claims are ultimately all derivative of its central trademark infringement claim.

### C. [24]7 Customer's Unfair Competition Claim is Also Time-Barred

As with its other three causes of action, [24]7 Customer's claim under California's Unfair Competition Law should be dismissed as time-barred. The statute of limitations for an unfair competition claim is four years. Cal. Bus. & Prof. Code § 17208 ("Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued."). *See also Aoki v. Gilbert*, No. 2:11-cv-02797-TLN-CKD, 2014 U.S. Dist. LEXIS 101151 (E.D. Cal. July 23, 2014) (collecting cases). The statute of limitations for California's Unfair Competition Law begins to run on the date that the cause of action accrues, regardless of whether the plaintiff knew or should have known of the violation. *Medimatch, Inc. v. Lucent Techs., Inc.*, 120 F. Supp. 2d 842, 861 (N.D. Cal. 2000); *Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp. 1353 (C.D. Cal. 1995).

[24]7 Customer alleges that Intouch violated California's Unfair Competition Law by "use of the designation '24-7' and '24-7 Intouch.'" Compl. ¶ 40. As discussed above, Intouch has been using these designations since well before June 3, 2010. [24]7 Customer's unfair competition claim is therefore time-barred.

### D. [24]7 Customer's Claims are Also Barred by Laches

In addition to the relevant statutes of limitations, [24]7 Customer's claims are also barred by the equitable doctrine of laches. *Cf. Jarrow*, 304 F.3d at 842; *GoTo.com, Inc. v. Disney*, 202 F.3d 1199, 1205 (9th Cir. 2000). The doctrine of laches embodies the principle that a plaintiff cannot obtain knowledge that a competitor is infringing its rights, wait for an extended period of time, and then later come forward and seek to enforce its rights. *Grupo Gigante*, 391 F.3d at 1102–03. Courts apply either a two-step test for laches or a related six-factor test. Under either approach, [24]7 Customer's claims should be barred.

    1. The Two-Step Test from *Jarrow*

Under the two-step test for laches, courts simply make two inquiries. First, was the plaintiff's delay in bringing suit unreasonable? Second, was the defendant prejudiced by the delay? If the answer to both questions is affirmative, laches is appropriate. *Jarrow* at 838; *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*, 465 F.3d 1102, 1108 (9th Cir. 2006).

a. Unreasonable Delay

Courts typically look to the applicable statute of limitations for guidance on whether a delay is unreasonable. *See Jarrow* at 835–36 ("[I]f suit is filed outside of the analogous limitations period, courts often have presumed that laches is applicable."). Since [24]7 Customer's claims are time-barred by the applicable statutes of limitations, they are also unreasonably delayed under the doctrine of laches.

When dealing specifically with trademark claims, courts have further clarified that "the laches clock begins when the plaintiff knows or should know of the 'prospect of confusion,' not when 'the likelihood of confusion loom[s] large.'" *RSI Corp. v. IBM*, No. 5:08-cv-3414 RMW, 2012 U.S. Dist. LEXIS 112294, at *45 (N.D. Cal. Aug. 9, 2012) (quoting *Tillamook*, 465 F.3d at 1109). Here, [24]7 Customer's twelve-year delay is objectively unreasonable because it knew or should have known of the "prospect of confusion" it now claims more than a decade ago. [24]7 Customer's delay is unreasonable, and the first half of the two-step laches test is satisfied.

b. Prejudice

The Ninth Circuit recognizes two primary forms of prejudice for laches purposes: (1) expectations-based prejudice, and (2) evidentiary prejudice. Either is sufficient to support a finding of laches. *See RSI Corp*. at *48. A party can show expectations-based prejudice by procuring evidence that it took actions that it would not have if plaintiff had brought suit promptly. *Id*. at *49. Expectations-based prejudice includes time and money spent developing a marketing program, cultivating a market, and developing relationships with clients. *Miller v. Glenn Miller Prods.*, 318 F. Supp. 2d 923, 944 (C.D. Cal. 2004) (barring all of plaintiff's claims on laches grounds), *aff'd* by *Miller v. Glenn Miller Prods.*, 454 F.3d 975 (9th Cir. 2006); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir. 1999) ("Had [plaintiff] successfully pressed its claims in a timely manner, [defendant] certainly could have invested its time and money in other areas or simply renamed its products. Accordingly … [defendant] was prejudiced by this delay.").

Here, Intouch has spent the past twelve years building up goodwill and market recognition for its "24-7 Intouch" brand. As described in Section I, Intouch's efforts have included millions of dollars spent on print and online advertising, sponsoring tradeshows, and social media marketing. RJN Exs. 8–72. And Intouch's efforts have paid off, as Intouch is now recognized as an industry

1  leader in terms of both customer satisfaction and business growth.  RJN Exs. 8, 10, 16–18, 27–29.
2  Considering Intouch's investment of time and money spent developing its marketing, cultivating a
3  market, and developing relationships with its clients over the past fourteen years, Intouch faces
4  significant prejudice as a result of [24]7 Customer's failure to bring its claims in a timely fashion.
5  *See Miller* at 944; Hot Wax at 824.
6      [24]7 Customer failed to bring its claims for an unreasonably lengthy time, and the resulting
7  delay will significantly prejudice Intouch.  Under the two-step test from *Jarrow*, the Court should
8  dismiss [24]7 Customer's causes of action under the equitable doctrine of laches.
9          2.   The Six-Factor Test From *E-Systems*
10      Under the six-factor test for laches, courts examine the following factors to determine whether
11  the application of laches is appropriate: (a) the strength and value of the trademark rights asserted, (b)
12  plaintiff's diligence in enforcing its mark, (c) the harm to the senior user if relief is denied, (d) good
13  faith by the junior user, (e) competition between the senior and junior users, and (f) the extent of
14  harm suffered by the junior user due to the senior user's delay.  *E-Systems*, 720 F.2d at 607; *Grupo*
15  *Gigante*, 391 F.3d at 1102.  These factors are fundamentally similar to the two-step test; it is
16  therefore unsurprising that the six-factor test also indicates that [24]7 Customer's claims are barred
17  by laches.
18          a.   [24]7 Customer's Marks are Weak
19      [24]7 Customer's marks are weak because they are merely descriptive.  The only alleged
20  infringement between [24]7 Customer's marks and Intouch's mark is simply that both share the term
21  "24-7."  *See* Compl. ¶¶ 16, 18, 26, 27, 32, 35, 36, 40, 41.  However, [24]7 Customer's "24-7" and
22  "[24]7" marks[5] are not distinctive.  A mark is not distinctive if it is either generic or descriptive.
23  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.9 (9th Cir. 1998).
24  "Descriptive marks define qualities or characteristics of a product in a straightforward way that
25  requires no exercise of the imagination to be understood." *Id*. at 1046.
26      The "24-7" and "[24]7"marks simply define qualities of [24]7 Customer's business: namely,
27  that they provide customer service 24 hours a day, 7 days a week.  This application requires no
28  imagination to be understood.  *Cf. ATM Express, Inc. v. ATM Express, Inc.*, No. 07-cv-1293, 2009

---

[5] The "24/7" mark is U.S. Registration No. 4,488,955, and the "[24]7" mark is U.S. Registration No. 4,429,355

1  U.S. Dist. LEXIS 83756, at *12 (S.D. Cal. Sept. 11, 2009) ("It takes no imagination to arrive at the

2  conclusion that the name ATM Express is descriptive of automated teller machine products or

3  services, which is the nature of Plaintiff's business.") .

4       [24]7 Customer's remaining mark, "24/7 CUSTOMER,"[6] may be distinctive, but the only

5  possibility for confusion between "24/7 Customer" and "24/7 Intouch remains the use of "24-7."

6  Thus, since the purpose of this analysis is to determine the equities involved in the present dispute, all

7  of [24]7 Customer's marks are weak for the purposes of this laches test.

8            b.   [24]7 Customer's Failed to Enforce its Marks

9       [24]7 Customer failed to police its trademark rights for nearly a decade prior to bringing suit

10 despite the fact that Intouch's use of its brand was open and well publicized.  As discussed above, it

11 is simply unreasonable for a company to share the exact same market in the exact same industry for

12 nine years without discovering the name of the companies with which it competes.  [24]7 Customer's

13 complete failure to police its alleged trademark rights alone should be fatal to its claims.

14           c.   There is No Harm to [24]7 Customer if Relief is Denied

15     Because Intouch has been operating in the same market using the same brand for over twelve

16 years, it is difficult to see what harm will come to [24]7 Customer if its claims are barred by laches.

17 Indeed, any harm would presumably have occurred more than a decade ago, before both companies

18 were as firmly established in the marketplace.

19           d.   Intouch Acted in Good Faith

20      Intouch has used its marks for the past twelve years in the same market as [24]7 Customer.

21 After such an expanse of time, there can be no doubt that Intouch has been operating under the good

22 faith belief that its brand does not infringe on any of [24]7 Customer's rights.  Indeed, [24]7

23 Customer makes no allegation in its complaint that it made any effort to contact Intouch regarding

24 any alleged infringement prior to the filing of the complaint.

25           e.   Competition Between Intouch and [24]7 Customer

26      Intouch and [24]7 Customer have shared the same market in the same industry for over twelve

27 years.  Indeed, this competition is the very reason why it is inequitable for [24]7 Customer to

28 suddenly bring suit.  Put simply, [24]7 Customer and Intouch are in no more competition today than

---

[6] United States Registration No. 3,152,855.

they were a decade ago, so it is inequitable to permit [24]7 Customer to bring suit now after it has failed to do so for so long.

      f. Significant Harm to Intouch Due to [24]7 Customer's Delay

  As described above, Intouch has spent millions of dollars and countless hours developing its marketing, cultivating a market, and developing relationships with its clients over the past fourteen years. Intouch therefore faces significant harm as a result of [24]7 Customer's failure to police its alleged trademark rights. *See Miller* at 944; *Hot Wax* at 824.

  Simply put, it is inequitable for [24]7 Customer to operate in the same market as Intouch for twelve years before deciding that Intouch's very name infringes upon its trademarks. For the reasons described above, under either the two-step test from *Jarrow* or the six-factor test from *E-Systems*, the doctrine of laches bars [24]7 Customer's claims.

  **E. The "[24]7" and "24/7" Trademarks Do Not Save [24]7 Customer's Claims from the Statute of Limitations or Laches**

  [24]7 Customer's two recent trademark registrations — the "[24]7" mark on November 5, 2013 and the "24/7" mark on February 25, 2014 (RJN Exs. 2, 3) — cannot save their claims from either the applicable statutes of limitations or laches. These marks are junior to Intouch's common law rights to its "24-7 Intouch" brand. Any attempt to argue that the "[24]7" or "24/7" marks retain the seniority of [24]7 Customer's 2004 "24/7 CUSTOMER" mark (RJN Ex. 1) would fail for several reasons. First, such "tacking" is appropriate only where the "previously used mark is the legal equivalent of the mark in question or indistinguishable therefrom such that consumers consider both as the same mark." *Brookfield Communications v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047–48 (9th Cir. 1999). In this case, the "[24]7" and "24/7" marks are quite clearly not the legal equivalent of the "24/7 CUSTOMER" mark. The term "24/7" is descriptive (see Section II(E), *infra*), such that the mark "24/7 CUSTOMER" achieves distinctiveness only as a whole. Thus, the "[24]7" and "24/7" marks cannot permit tacking, and cannot save [24]7 Customer's claims. Indeed, if the "[24]7" and "24/7" marks were legally equivalent, then permitting the registration of the "[24]7" and "24/7" marks to affect Intouch's statute of limitations and laches defenses would be to eviscerate those defenses entirely.

1    In addition, [24]7 Customer's trademark registrations for the "[24]7" and "24/7" marks
2 indicate that both were first used in commerce on April 11, 2000. RJN Ex. 2, 3. Ownership of a
3 trademark occurs not at registration, but at the trademark's first use. *Sengoku Works Ltd. v. RMC*
4 *Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). If [24]7 Customer owned the marks in 2000, then it
5 also accepted the responsibility of policing those marks as of 2000. The fact that they did not register
6 their marks until thirteen years later does nothing to alter the applicability of the statute of limitations
7 and laches.
8    Finally, as discussed in Section II(E), *infra*, the "[24]7" and "24/7" marks are insufficiently
9 distinctive to support a claim, let alone a claim that is otherwise time-barred. Because the "[24]7"
10 and "24/7" marks are invalid, they cannot be tacked to the "24/7 CUSTOMER" trademark. For these
11 reasons, the fact that the "[24]7" and "24/7" marks were filed in 2013 and 2014 is insufficient to
12 prevent the application of the statute of limitations and laches to [24]7 Customer's claims in this
13 litigation.

### F. [24]7 Customer Fails to State a Claim Regarding its Trademarks

15    [24]7 Customer also fails to state a cause of action upon which relief may be granted because
16 the "24-7" and "[24]7" marks are insufficiently distinct and [24]7 Customer fails to allege facts
17 sufficient to show that the remaining "24/7 CUSTOMER" mark is likely to cause confusion. "To
18 state an infringement claim … a plaintiff must meet three basic elements: (1) distinctiveness, (2)
19 nonfunctionality, and (3) likelihood of confusion." *Kendall-Jackson Winery*, 150 F.3d at 1046. As
20 discussed above, [24]7 Customer's marks are not distinctive; rather, they are merely descriptive
21 because they require no imagination to be understood. *See id*. at 1046, 1047 n.9; *ATM Express* at *12.
22 Because they are purely descriptive, the "24-7" and "[24]7" marks are insufficient to support a claim
23 of trademark infringement. The Court should therefore dismiss [24]7 Customer's claims with regard
24 to the "24-7" and "[24]7" marks for failure to state a cause of action upon which relief may be
25 granted.
26    With regard to the "24/7 CUSTOMER" mark, [24]7 Customer fails to allege a likelihood of
27 confusion sufficient to support its causes of action. "Likelihood of confusion exists when customers
28 viewing the mark would probably assume that the product or service it represents is associated with
the source of a different product or service identified by a similar mark." *Fuddruckers, Inc. v. Doc's*

*B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987).  Courts consider eight factors in determining whether use of a mark creates a likelihood of confusion: (1) strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) the type of goods and degree of care likely exercised by the purchaser, (7) the defendant's intent in using the mark, and (8) the likelihood of expansion of product lines.  *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–349 (9th. Cir. 1979).  An analysis of [24]7 Customer's Complaint reflects a failure to allege facts sufficient to create even an arguable likelihood of confusion.

1. Strength of the Mark

Whatever strength the "24/7 CUSTOMER" mark may have, the fact is that [24]7 Customer has not alleged any facts beyond the fact that shares the term "24-7" with Intouch's mark.  As discussed above, the "24-7" portion of the mark is purely descriptive, and thus weak.

2. Proximity of the Goods

The parties agree that they offer the same goods to the same market.

3. Similarity of the Marks

The only similarity between the "24/7 CUSTOMER" and "24-7 Intouch" marks is that they share the descriptive term "24-7."  *See* Compl. ¶ 18.  As discussed below, the specific nature of the parties' industry is such that there is little to no risk of actual confusion based on this minimal similarity.

4. Evidence of Actual Confusion

While [24]7 Customer alleges that it "is aware of several instances of actual confusion in which potential customers of [24]7 have confused the two companies," it offers no support for that conclusory statement.  *See* Compl. ¶ 20.  This formulaic recitation of one of the elements of [24]7 Customer's causes of action is insufficient to meet its pleading obligations.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  This factor thus offers no support to [24]7 Customer's claims.

5. Marketing Channels Used

[24]7 Customer's Complaint has no allegations related to marketing channels.  As discussed earlier, [24]7 Customer and Intouch use the same marketing channels to market their product; this is why [24]7 Customer knew or should have known of Intouch's brand for more than twelve years before this suit was initiated.

### 6. Type of Goods and Degree of Care Exercised by Consumer

As [24]7 Customer alleges, the goods involved in this case are "contact center solutions," "customer analytics," and "software platform[s] that allow[] agents to provide service on multiple platforms." Compl. ¶ 17. The customers are "many of the world's most recognized companies and brands … and other clients in the financial services, retails technology, communications, and travel industries…." Compl. ¶ 15. In short, the customers at issue here are not picking up a box off the shelf; these are sophisticated parties who will perform a serious analysis before entering into a contract with either [24]7 Customer or Intouch. These customers regularly demand financial statements, on-site visits, customer references, and additional materials before making their decision. They exercise a very high degree of care, making the likelihood of confusion very low.

### 7. Defendants' Intent in Using the Marks

[24]7 Customer has made no allegations regarding Intouch's use of its marks, and for good reason. Intouch's intent is simply to capitalize on the goodwill it has built up over the past twelve years.

### 8. Likelihood of Product Line Expansion

[24]7 Customer's Complaint alleges no facts regarding product line expansion. By far the most compelling of the above eight factors is the fact that the customers, as alleged by [24]7 Customer, functionally eliminate the possibility of confusion due to their relative sophistication; similarly, the goods involved are such that any potential customers would conduct a thorough analysis before signing a contract with any party. These factors show that [24]7 Customer has failed to allege a likelihood of confusion with regard to its "24/7 CUSTOMER" mark. [24]7 Customer's claims should therefore be dismissed for failure to state a cause of action upon which relief may be granted.

### G. [24]7 Customer's Claims Should be Dismissed with Prejudice

A plaintiff's claims should be dismissed with prejudice if amendment would be futile. *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990). Here, there is nothing that [24]7 Customer can do to cure the deficiencies in its claims: it cannot alter the passage of time to negate the defenses of the statute of limitations and laches, and no pleading in the world will render its "24-7" and

"[24]7" marks distinctive or change the likelihood of confusion in the industry. Therefore, [24]7 Customer's claims must be dismissed with prejudice.

## IV. CONCLUSION

For the reasons stated above, Defendants respectfully request that [24]7 Customer's claims be dismissed with prejudice as time-barred under the statute of limitations and laches and for failure to statue a cause of action upon which relief may be granted.

Date: August 25, 2014  Submitted By,

COLT / SINGER / BEA LLP

By: /s/ Walter C. Pfeffer
Doug W. Colt
Walter C. Pfeffer
Attorneys for Defendants